RONALD E. DE ANGELES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Angeles v. Commissioner
Docket No. 9078-75.
United States Tax Court
T.C. Memo 1983-78; 1983 Tax Ct. Memo LEXIS 709; 45 T.C.M. (CCH) 682; T.C.M. (RIA) 83078; February 7, 1983. David R. Mackenzie, for the petitioner. Stuart B. Kalb, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined the following deficiencies and additions to tax in petitioner's Federal income tax for taxable years 1969, 1970, and 1971: Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1969
$787.00
$492.00
$98.40
1970
2,190.00
1,035.25
207.05
1971
38,125.86
1,906.29
Due to concessions by the parties, the remaining issues are what income petitioner received from Gaylur Products, Inc., in 1971 and *710 whether petitioner is liable for the section 6651(a) [1] and section 6653(a) additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. [2]
Petitioner resided in Florida when he filed the original and the first joinder petitions in this case. [3]
*711 On July 6, 1971, petitioner, doing business as R&D Engineering Company (R&D), a sole proprietorship, entered into a contract with Gaylur Products, Inc. (Gaylur). The contract provided that R&D would: (1) arrange for the purchase of all equipment necessary for the operation of a machine shop and molding plant at Gaylur's Deming, N. Mex., facility; (2) furnish Gaylur with a vacuum forming hubcap mold that would produce plastic imitation magnesium (mag) wheels; (3) design several plastic pails and covers; (4) convert and completely recondition three Lester L500 presses to three Egan 70-Ounce 3 1/2 20 Reciproscrew presses; and (5) design and construct three pail molds and three cover molds for a five gallon plastic pail. Gaylur agreed to pay R&D $25,000 for the first three tasks, $90,000 for the fourth task, and $75,000 for the fifth task. Payment was to be made in the following manner: 50 percent upon the signing of the contract, an additional 25 percent upon the arrival in Deming, N. Mex., of all the equipment necessary for the conversion of the Lester presses to Egan presses, and the final 25 percent upon satisfactory completion of the contract. During 1971, Gaylur paid R&D $156,230.98, *712 in 12 checks pursuant to the terms of the contract. The first check was delivered on July 6 with the signing of the contract; the last check was dated October 22. Each check was received and endorsed by petitioner and then deposited in petitioner's "sole proprietorship" bank account at either Deming National Bank (Deming) or Melrose Park National Bank (Melrose). [4] The amount of each check was reflected on Gaylur's and R&D's books as being a payment pursuant to the R&D contract. On July 10, 1971, petitioner paid $1,000 out of R&D's Melrose *713 account as a down payment on a house. On August 16, 1971, Thunderbird Land Development Company, Inc. (Thunderbird) conveyed the house to R&D Engineering Company. Three days later petitioner paid $19,100, the remaining balance on the house's "initial purchase price", out of R&D's Deming account. On September 17, petitioner paid $3,700 for a swimming pool and on October 8 he paid $8,000 to cover the "final purchase price" of the house. Each of these payments came out of R&D's Deming account. On August 19, 1971, petitioner d/b/a R&D Engineering Company purchased an airplane from Bellanca Sales Company (Bellanca) for a purchase price of $36,700, giving a $6,700 down-payment check drawn on R&D's Melrose account. The purchase price was subsequently reduced to $35,490 and a check for $1,210 was issued on September 7 from Bellanca to petitioner d/b/a R&D Engineering Company. Also on September 7, 1971, petitioner d/b/a R&D Engineering Company procured a $30,000 bank loan ($39,000 including finance charges) from American National Bank (American) at Amarillo, Texas, the proceeds of which were used to complete the plane's purchase. As security for the loan petitioner pledged the plane *714 and a $15,000 certificate of deposit purchased from American on September 5, 1971, with funds from R&D's Melrose account. On September 27, 1971, petitioner paid American $1,300 out of R&D's Deming account toward repayment of the $30,000 loan. During the latter part of 1971, Miller D. Mickelson, a CPA, prepared a profit and loss statement for R&D. The statement reflected an excess of funds from the R&D contract over expenditures of the contract in the amount of $73,784.35. When petitioner was presented with the profit and loss statement in November 1971, he examined the figures (notably the $73,784.35 figure) and asked Mickelson, "What would be the income tax on this kind of a figure?" Mickelson estimated that it would be 30 to 40 percent; petitioner made no further comment concerning the tax rate. On February 10, 1972, petitioner executed an affidavit stating that he was on that date, and had been since August 16, 1971, the sole owner of R&D Engineering Company (a sole proprietorship) and that title to the house petitioner was residing in had erroneously been granted to R&D whereas the deed should have been taken in the name of Gaylur Products, Inc. This affidavit was filed *715 in the public records of Luna County, N. Mex., on February 11, 1972, along with a quitclaim deed dated February 10, 1972, reflecting a transfer from petitioner, Linda DeAngeles, and petitioner d/b/a R&D to Gaylur, and a correction warranty deed, reflecting a transfer from Thunderbird to Gaylur. Later, Gaylur executed a deed dated April 10, 1972, reflecting a transfer of the house from it to petitioner and Linda DeAngeles. In October, 1972, Gaylur hired Lee Adamson, a CPA, to consolidate the activities of R&D with Gaylur on Gaylur's books and to prepare Gaylur's income tax return for the year ending December 31, 1971. Pursuant to this objective, Adamson prepared several journal entries in Gaylur's books to reverse the accounts charged with the payments to petitioner pursuant to the R&D contract. In 1973, Paul Sherman, an attorney hired by Irwin Weiner, Gaylur's president, was instructed to and did prepare corporate minutes for several of Gaylur's director and officers meetings. According to these minutes, Gaylur decided in August 1971 to authorize petitioner to purchase on behalf of the corporation a Bellanca airplane. The plane would be purchased in petitioner's name on condition *716 that he acknowledge, in writing, that he held the plane in trust for Gaylur. According to the September 1971 minutes, petitioner was authorized to purchase suitable housing on behalf of the corporation. The house could be purchased either in the corporation's name or in petitioner's own name so long as a quitclaim deed was drawn reconveying the property to the corporation.Finally, according to the November 1971 minutes, petitioner and Irwin Weiner had entered into an agreement whereby the R&D contract was mutually cancelled, petitioner was made executive vicepresident of Gaylur and all assets owned by petitioner "in process pursuant to said contract" were conveyed to Gaylur. After an IRS audit, petitioner and others were indicted by a Special January 1974 Grand Jury. Petitioner was charged, inter alia, with willfully making and subscribing to a false 1971 Federal income tax return under section 7206(1) and of conspiring to defraud the United States in respect of Federal income taxes. After a long trial, petitioner and the other defendants were acquitted of all charges. Respondent determined, in his deficiency notice of July 2, 1975, that in 1971 R&D had gross receipts of *717 $156,230.98 and allowable deductions of $66,275.84 [5] for a net profit of $89,955.14. Petitioner's Schedule C form (profit or loss from sole proprietorship) for 1971 listed a net profit of $6,596.62. Consequently, respondent determined that petitioner's income should be increased by $83,358.52. OPINION We must determine three factual issues: (1) what income did petitioner receive from Gaylur in 1971; (2) was any underpayment of petitioner's tax for 1969, 1970, and/or 1971 due to negligence or intentional disregard of rules and regulations (but without intent to defraud); and (3) was the late filing of petitioner's 1969 and/or 1970 returns due to reasonable cause? The burden of proof as to each issue is on the petitioner. Rule 142(a). We first address petitioner's argument that he is entitled to a decision in his favor on the ground that respondent is acting in bad faith by forcing him to relitigate the "same issues" for which he was criminally prosecuted and acquitted. This argument is totally without merit. It is crystal clear *718 that respondent is entitled to litigate a civil tax fraud case after losing a criminal tax fraud case based on the same facts. . This well-established principle is based in part on the distinction between the standard of the Government's burden of proof in a criminal tax fraud case and the standard which applies in a civil fraud case -- beyond a reasonable doubt versus clear and convincing evidence. Id. This principle applies a fortiori to the instant situation, where the burden of proof is on the petitioner in respect to the factual foundation of the deficiency and additions to tax which involve negligence and late filing rather than fraud. Granted that this case and the prior criminal case have substantially the same factual foundation, petitioner's acquittal is not proof that the jury agreed with his version of such factual foundation; the acquittal simply indicates that the jury had sufficient reservations about the Government's version to require the conclusion that the beyond-a-reasonable-doubt standard had not been satisfied. See . *719 We now turn to the factual issues before us. Petitioner argues that the "crux of the controversy" in this case revolves around who owned the house and the airplane petitioner purchased. Petitioner contends that (1) despite the contract between him and Gaylur, it was understood from the beginning of his relationship with Gaylur that petitioner would use money received from Gaylur to purchase certain assets which he would hold in trust for Gaylur and/or (2) in November of 1971, the contract with Gaylur was rescinded and petitioner was required to return to Gaylur all proceeds therefrom except those used to pay R&D's expenses. For the reasons discussed below, we reject petitioner's contentions and hold that respondent's determinations should be sustained. To support his two contentions, petitioner relies heavily upon events occurring after the fact and on testimony presented at the earlier criminal trial by persons with no personal knowledge of the transactions. Such reliance is misplaced. The critical issue is how did the various parties to the transactions perceive those transactions in 1917? Later reconstructions of the events, made after petitioner was informed of his potential *720 tax liability for 1971, are not persuasive. For example, petitioner places great emphasis upon Gaylur's corporate minutes of the fall 1971 director and officers meetings. However, these minutes were prepared in 1973 by an attorney who was not present at any of the meetings and who reconstructed the minutes solely from representations made by Gaylur's president, Irwin Weiner, and by petitioner, who were by then under investigation by the Internal Revenue Service. Consequently, we give little weight to these self-serving, after-the-fact declarations of interested parties. Similarly, petitioner points to the testimony of several accountants and lawyers whose knowledge of the 1971 events came solely from petitioner and/or Irwin Weiner. Three of these witnesses, CPAs Lee Adamson and H. Kent Pace and attorney Paul Sherman, were not even informed of the events until after 1971. A fourth, CPA Mickelson, although involved in 1971, was not given the story petitioner now relies upon until after Mickelson told petitioner that petitioner had $73,000 in income from R&D. Prior to that time, petitioner had told Mickelson that petitioner owned the house in Deming and Mickelson had prepared *721 disbursement sheets to that effect. Only after petitioner was informed of the tax consequences of his R&D operation did he inform Mickelson that the status of R&D as a sole proprietorship had "changed." Since none of the first three witnesses had any firsthand knowledge of how the R&D contract was viewed in 1971, we give little weight to their testimony. To a large degree, this lack of firsthand knowledge also applies to Mickelson's testimony; additionally, that testimony is based on events which transpired after petitioner was informed of his potential tax liability. Only one witness seems to have known of the events while they were transpiring. Ronald Sherman, Gaylur's plant manager, testified that he suggested to Irwin Weiner during the summer of 1971 that Gaylur purchase an airplane, that he (Sherman) "arranged" some of the financing for the plane with the First National Bank of Dona Ana County, and that from the beginning the plane was to be company owned. We do not find, however, that this testimony, when evaluated with the other evidence presented, is strong enough to carry petitioner's burden of proof. Petitioner also points to several events which allegedly occurred *722 after 1971 that "prove" his position regarding the 1971 transactions. Among these alleged events are various title transfers to the house, Gaylur's sale of the house to petitioner and petitioner's payment therefor, Gaylur's sale of the plane and retention of the proceeds, and the incorporation of R&D as a subsidiary of Gaylur in June 1972. [6] Accepting for the moment petitioner's position that these events actually occurred, petitioner has nevertheless failed to convince us that their occurrence "proves" that certain other events occurred at all, much less that they occurred in 1971. In support of his first contention (that he held the house and plane in trust for Gaylur), petitioner cites, in addition to the factors already discussed, the rule that legal title to property can be taken in the name of a key employee to hold as constructive trustee. This rule has no application to the instant case, however, because petitioner concedes that prior to "late October" 1971 he was an independent contractor and *723 not a Gaylur employee. Moreover, even if this rule would apply to independent contractors (an assertion petitioner has not made in this case), petitioner has not shown that, in July and August 1971, Gaylur desired its property to be held in trust by an outsider who had just entered into a contractual relationship with the corporation. Several factors cited by respondent further support our determination that in 1971 petitioner did not hold the house and plane in trust. First, title to the house and plane was held in the name of R&D. [7] Second, Harold Lurie, a business and personal friend of Irwin Weiner's, testified that, in February 1972, petitioner angrily told him that even though he (petitioner) owned the house, an attorney was making Mr. Weiner take the house from petitioner and have it put into Gaylur. Petitioner, Lurie continued, did not like this being done. Similarly, petitioner admits that he received a $1,210 refund on the purchase price of the plane and that on September 27, 1971, he paid $1,300 towards repayment of the $30,000 loan obtained to purchase the plane. [8] Finally, the entries on Gaylur's books for each of the 12 checks respondent included in petitioner's *724 gross receipts carried the notation "per contract." These factors all support our conclusion that petitioner owned the house and plane individually and did not hold them in trust for Gaylur. [9]
*725 We reject petitioner's second contention, that the R&D contract was rescinded in 1971, for two reasons. First, petitioner has not carried his burden of proving that R&D was absorbed by Gaylur in 1971. Although the corporate minutes support petitioner's contention, we decline to give them much weight for the reasons previously stated.None of the other evidence directly supports petitioner's contention. Of the several accountants who treated Gaylur and R&D as one, only Mickelson was informed in 1971 that R&D had been absorbed and even he was not told of the development until after he informed petitioner that R&D had over $73,000 of taxable income. Moreover, Laurence Weiner, Irwin Weiner's accountant, [10] testified that he recommended against a proposed merger of Gaylur and R&D in June 1972. Finally, petitioner's position conflicts with an affidavit signed by petitioner which states that between August 16, 1971, and February 10, 1972, R&D was a sole proprietorship. On this record, we are unable to find that a merger occurred in 1971. *726 Second, even if we were to find that Gaylur absorbed R&D and even if we were to find that the contract between them was rescinded in November 1971 (the corporate minutes say "mutually cancelled"), we would not conclude that petitioner is not taxable on his profit with respect to the work performed under the contract with Gaylur. Apparently, petitioner would have us believe that he collected over $156,000 "per contract," made expenditures of over $83,000 (some of which respondent has disallowed), and maintained a separate office in Gaylur's plant for four months without doing anything that would have entitled him to retain more than an unexplained $6,596.62 of his $89,955.14 in profits under the contract. Having rejected each of petitioner's arguments why he should not include R&D's profit in his taxable income, we observe that, although petitioner disagrees with respondent's disallowance of $17,218.79 of petitioner's alleged business deductions, petitioner has presented no proof that any of respondent's disallowances are inaccurate. Therefore, we have no choice but to sustain respondent's determination of petitioner's 1971 taxable income.
We must now decide whether petitioner *727 is subject to the section 6653(a) addition to tax for 1969, 1970, and 1971 for an underpayment due to negligence or intentional disregard of rules and regulations. Petitioner has presented no proof that he is not subject to the addition for either 1969 or 1970. Petitioner does assert, however, that he is not subject to the addition for 1971 because he employed a CPA to file his return. Hiring a CPA will not negate a section 6653(a) addition to tax, however, where, as here, the petitioner did not furnish complete information concerning the status of R&D as a sole proprietorship and the ownership of the house that is necessary for filing a correct return. See . We hold, therefore, that petitioner is liable for the section 6653(a) addition for each of the years in issue. The last issue is whether petitioner is liable for the addition to tax under section 6651(a) for the late filing of his 1969 and 1970 returns. Respondent stamped each return as being received on June 22, 1971. Petitioner did not date either return and has not alleged or proved that either was filed on time. Furthermore, petitioner has *728 not alleged or proved that the late filing of either return was due to reasonable cause and not due to willful neglect. Consequently, petitioner has failed to show that he is not subject to the section 6651(a) addition for 1969 and 1970. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. This case was actually submitted as fully stipulated with portions of the testimony of a prior criminal case to which petitioner was a party-defendant (United States v. Weiner,↩ (N.D. Ill., Dkt. No. 74 CR 336)) as the testimony herein. As a consequence, the Court had no opportunity to see and hear any witnesses.
3. Petitioner and his wife, Linda DeAngeles, filed joint income tax returns for each of the years in issue. At some point thereafter, according to petitioner, he and his wife were divorced. Both deficiency letters were addressed to Ronald E. and Linda DeAngeles.However, only Ronald DeAngeles signed the petitions herein. The original petition was in response to the notice of deficiency for the taxable year 1971 and the first joinder petition was by way of an amended petition which included the response to the notice of deficiency for the taxable years 1969 and 1970.↩
4. The 12 checks were drawn and deposited as follows: ↩
Date
Amount
Deposited to
7- 6-71
$19,000.00
Melrose Park National Bank
7-14-71
20,000.00
Melrose Park National Bank
7-21-71
9,500.00
Melrose Park National Bank
7-23-71
1,237.61
Melrose Park National Bank
8- 4-71
21,500.00
Melrose Park National Bank
8-17-71
8,650.72
Deming National Bank
8-19-71
15,000.00
Deming National Bank
9- 3-71
292.65
Deming National Bank
9- 3-71
33,750.00
Deming National Bank
9-23-71
300.00
Deming National Bank
10- 9-71
17,000.00
Deming National Bank
10-22-71
10,000.00
Deming National Bank
$156,230.98
5. Respondent determined that R&D's books and records reflected business expenses of $83,494.63, of which respondent allowed $66,275.84.↩
6. Petitioner also alleges, quite summarily, that the plane was used for Gaylur's purposes. He has neither alleged nor proved, however, that the plane was so used in 1971.↩
7. Petitioner contends that the title documents pertaining to these assets did not mention the trust arrangements because the purpose of the trusts was to permit Gaylur, which he claimed was suffering from a bad credit rating, to borrow funds and purchase assets and if the trusts were disclosed, this purpose would be defeated. Petitioner further contends that it is not unusual for such trust arrangements to remain undisclosed. We are unwilling to accept this explanation in light of the absence of any written trust document and the other documentary evidence of record. ↩
8. Furthermore, petitioner listed the house, on the application for the $30,000 bank loan, as an asset of R&D. ↩
9. We note that petitioner did not see fit to testify in this proceeding nor call Irwin Weiner as a witness; nor has the testimony of either of them at the criminal trial, if in fact they testified therein, been stipulated. See note 2. See also , affd. . We also observe that while there is no correlation between the payments made by Gaylur to R&D and the schedule of payments required under the June 1971 contract, there is also no correlation between amounts and dates of such payments and the amounts and dates of payments on account of the purchase of the house and the plane.↩
10. Although Laurence and Irwin Weiner had a social and business relationship during the years in issue, they were not related by either blood or marriage.↩